1
2
3
4
5
6
7

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Sean L. Litteral (State Bar No. 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com
            slitteral@bursor.com

*Attorneys for Plaintiffs and the Proposed Classes*
[Additional counsel listed on signature page]

8
9
10

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17
18

| | |
|---|---|
| SUSAN GAGETTA and TRACIE GOMEZ, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> WALMART INC., <br><br> Defendant. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

19
20
21
22
23
24
25
26
27
28

Plaintiffs Susan Gagetta and Tracie Gomez, individually and on behalf of all others similarly situated, allege the following against Defendant Walmart, Inc. ("Walmart" or "Defendant") on information and belief, except that Plaintiffs' allegations as to their own actions are based on personal knowledge.

## NATURE OF THE ACTION

1.      This action seeks to recover damages and injunctive relief for Defendant's continuing failure to disclose to consumers that certain Walmart Inc. herbs and spices sold under the brand name "Great Value," including Great Value's Basil Leave, Chili Powder, Ground Cumin, Organic Ground Ginger, and Organic Paprika (collectively, the "Products"), contain (or risk containing) lead, arsenic, and cadmium (collectively "Heavy Metals").

2.      A November 2021 report by Consumer Reports states that the offending herbs and spices, including the Products, "had high enough levels of arsenic, lead, and cadmium combined, on average, to pose a health concern for children when regularly consumed in typical servicing sizes. Most raise concern for adults, too."[1]

3.      Heavy Metals in foods pose a serious safety risk to consumers because they can cause cancer and serious and often irreversible damage to brain development as well as other serious health problems.

4.      As described more fully below, consumers who purchase the Products are injured by Defendant's acts and omissions concerning the presence (or risk) of Heavy Metals.  No reasonable consumer would know, or have reason to know, that the Products contain (or risk containing) Heavy Metals.  Worse, as companies across the industry have adopted methods to limit heavy metals in their herbs and spices, Defendant has stood idly by with a reckless disregard for its consumers' health and well-being.  As such, Plaintiffs seek relief in this action individually and as a class action on behalf of all purchasers of the Products.

///

---

[1] Lisa L. Gill, "Your Herbs and Spices Might Contain Arsenic, Cadmium, and Lead," *Consumer Reports* (Nov. 9, 2021), https://www.consumerreports.org/food-safety/your-herbs-and-spices-might-contain-arsenic-cadmium-and-lead/ (last accessed June 22, 2022).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PARTIES**

5.      Plaintiff Susan Gagetta is a resident of Antioch, California, and a citizen of the State of California.  Ms. Gagetta has purchased several of Defendant's Products, including Great Value's Chili Powder and Organic Paprika, as recently as May 2022 from Instacart and a Walmart located in Antioch, California.  Plaintiff Gagetta believed she was purchasing quality and healthy spices that did not contain (or have a risk of containing) Heavy Metals. Had Defendant disclosed on the label that the Products contained (or risked containing) unsafe toxic Heavy Metals, Ms. Gagetta would have been aware of that fact and would not have purchased the Products or would have paid less for them.

6.      Ms. Gagetta continues to desire to purchase the Products from Defendant.  However, Ms. Gagetta is unable to determine if the Products are actually safe.  Ms. Gagetta understands that the composition of the Products may change over time.  But as long as Defendant continues to market its Products as safe, she will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Products and competitor's Products.  Ms. Gagetta is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that the Products marketed, labeled, packaged and sold as a safe and healthy spice is, in fact, a safe and healthy spice.

7.      Plaintiff Tracie Gomez is a resident of Morgan Hill, California, and a citizen of the State of California.  Ms. Gomez has purchased several of Defendant's Products, including Great Value's Basil Leave, Chili Powder, and Ground Cumin from a Walmart in Morgan Hill, monthly during the Class Period.  Plaintiff Gomez believed she was purchasing quality and healthy spices that did not contain (or have a risk of containing) Heavy Metals. Had Defendant disclosed on the label that the Products contained (or risked containing) unsafe toxic Heavy Metals, Ms. Gomez would have been aware of that fact and would not have purchased the Products or would have paid less for them.

8.      Ms. Gomez continues to desire to purchase the Products from Defendant.  However, Ms. Gomez is unable to determine if the Products are actually safe.  Ms. Gomez understands that the

composition of the Products may change over time.  But as long as Defendant continues to market its Products as safe, she will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Products and competitor's Products.  Ms. Gomez is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that the Products marketed, labeled, packaged and sold as a safe and healthy spice is, in fact, a safe and healthy spice.

9.     Defendant Walmart is a Delaware corporation with its headquarters in Bentonville, Arkansas.  Defendant manufactures, markets, and sells herbs and spices, including the Products, throughout California and the United States.  During the relevant period, Defendant controlled the manufacture, design, testing, packaging, labeling, marketing, advertising, promotion, distribution, and sales of its Products.  Defendant therefore had complete control over how to label its Products as to their contents.

### JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2 Stat. 4 ("CAFA"), which, *inter alia*, amends 28 U.S.C. § 1332, at new subsection (d), conferring federal jurisdiction over class actions where, as here: (a) there are 100 or more members in the proposed classes; (b) some members of the proposed classes have a different citizenship from Defendant; and (c) the claims of the proposed class members exceed the sum or value of five million dollars ($5,000,000) in aggregate. *See* 28 U.S.C. § 1332(d)(2) and (6).

11.     Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant transacts significant business within this District, at least one Plaintiff resides within this District, and a substantial part of the events giving rise to Plaintiff's claims took place within this District.

### FACTS COMMON TO ALL CAUSES OF ACTION

**I.     Lead, Arsenic, and Cadmium Are Toxic**

12.     Lead, arsenic, and cadmium are heavy metals.  As described more fully below, the harmful effects of heavy metals are well-documented, particularly on children.  Exposure puts

children at risk for lowered IQ, behavioral problems (such as attention deficit hyperactivity disorder), type 2 diabetes, and cancer, among other health issues. Heavy metals also pose risks to adults. Even modest amounts of heavy metals can increase the risk of cancer, cognitive and reproductive problems, and other adverse conditions. As such, it is important to limit exposure.

13.     "No amount of lead is known to be safe."[2]  Exposure to lead may cause anemia, weakness, and kidney and brain damage.[3]  Lead can affect almost every organ and system in the body. Lead accumulates in the body over time, and can lead to health risks and toxicity, including inhibiting neurological function, anemia, kidney damage, seizures, and in extreme cases, coma and death. Lead can also cross the fetal barrier during pregnancy, exposing the mother and developing fetus to serious risks, including reduced growth and premature birth. Lead exposure is also harmful to adults as more than 90 percent of the total body burden of lead is accumulated in the bones, where it is stored. Lead in bones may be released into the blood, re-exposing organ systems long after the original exposure.[4]

14.     Arsenic is also dangerous to humans. "Arsenic is ranked first among toxicants posing a significant potential threat to human health based on known or suspected toxicity."[5]  Long term exposure is linked to cardiovascular disease. Arsenic can also cause bladder, lung, liver, and skin cancer, and strokes and diabetes. Recent studies have suggested that arsenic may cause IQ deficits in children and may be harmful to fetal development as "even low concentrations of arsenic impair neurological function[.]"[6]  There is "essentially no safe level" of arsenic.[7]

---

[2]     *See* https://www.npr.org/sections/thetwo-way/2016/08/13/489825051/lead-levels-below-epa-limits-can-still-impact-your-health (last accessed June 22, 2022).
[3] Centers for Disease Control and Prevention, "Health Problems Caused by Lead," *The National Institute for Occupational Safety and Health (NIOSH)*, https://www.cdc.gov/niosh/topics/lead/health.html#:~:text=Exposure%20to%20high%20levels%20of,a%20developing%20baby's%20nervous%20system. (last accessed June 22, 2022).
[4] State of New York Department of Health, "Lead Exposure in Adults: A Guide for Health Care Providers," https://www.health.ny.gov/publications/2584.pdf (last accessed June 22, 2022).
[5] Christina R. Tyler and Andrea M. Allan, "The Effects of Arsenic Exposure on Neurological and Cognitive Dysfunction in Human and Rodent Studies: A Review," *Curr Environ Health Rep*. 2014; 1(2): 132-147, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4026128/ (last accessed June 22, 2022).
[6] *Id.*
[7]     *See* https://publicintegrity.org/environment/what-to-do-if-your-drinking-water-contains-arsenic/ (last accessed June 22, 2022).

---

15.     Cadmium is similarly harmful.   "[A]ny cadmium exposure should be avoided."[8] Exposure to cadmium may lead to damage to kidneys, lungs, and bones.[9]  "Even relatively low chronic exposure can cause irreversible renal tubule damage, potentially progressing to glomerular damage and kidney failure" and "bone loss often is seen in concert with these effects."[10]  This metal is also known to cause cancer and targets the body's cardiovascular, renal, gastrointestinal, neurological, reproductive, and respiratory systems.[11]

## II.     Defendant's Products Contain Toxic Arsenic, Lead, and Cadmium

16.     In November of 2021, Consumer Reports published a report titled "Your Herbs and Spices Might Contain Arsenic, Cadmium, and Lead."  Employing the Analysis for Arsenic, Cadmium, Lead, and Mercury by Triple Quadruple Inductively Coupled Plasma Mass Spectrometry (IC-QQQ-MS), With Collision Cell, Consumer Reports determined that each of the Products contains toxic Heavy Metals.  Consumer Reports' samples were prepared and analyzed in accordance with the Association of Official Analytical Chemists (AOAC) Method 2015.01.

17.     Consumer Reports analyzed "126 individual products from national and private-label brands, including Walmart's Great Value."[12]

18.     Consumer Reports determined that "[r]oughly one-third of the tested products, 40 in total, had high enough levels of arsenic, lead, and cadmium combined, on average, to pose a health concern for children when regularly consumed in typical serving sizes.  Most raised concern for adults, too."[13]

19.     The authors cautioned that "just one serving—3/4 teaspoons or more—per day leaves little room for heavy metal exposure from other sources" including in "fruit juice, baby food, and

---

[8] M. Nathaniel Mead, "Cadmium Confusion: Do Consumers Need Protection," *Environ Health Perspect.*     2010     Dec;     118(12):     A528-A534, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3002210/ (last accessed June 22, 2022).
[9] *See* Agency for Toxic Substances and Disease Registry, "ToxFAQs for Cadmium," Toxic Substances     Portal, https://wwwn.cdc.gov/TSP/ToxFAQs/ToxFAQsDetails.aspx?faqid=47&toxid=15 (last accessed June 22, 2022).
[10] Mead, *supra* note 8.
[11] *See* Occupational Safety & Health, "Cadmium," https://www.osha.gov/cadmium (last accessed June 22, 2022).
[12] *See n. 1, supra.*
[13] *Id.*

---

rice[.]"[14]   These latter food categories have also tested high for heavy metals and have been the subject of numerous lawsuits.

20.     With regards to the results, James E. Rogers, PhD, director of food safety and testing at Consumer Reports, remarked that "[w]hen people think about heavy metals in their diet, if they do at all, it's probably the lead in their drinking water or arsenic in their children's fruit juices or cereals . . . But our tests show that dried herbs and spices can be a surprising, and worrisome, source for children and adults."[15]

21.     Concerning the source of the heavy metals in herbs and spices, Consumer Reports stated that heavy metals may get into food, "including herbs and spices, during manufacturing— from processing equipment or packaging[.]"[16]

22.     Along these lines, Consumer Reports determined that "it is possible for herb and spice companies to limit heavy metals in their products" as "[a]bout two-thirds of the spices [Consumer Reports] tested did not have concerning levels of heavy metals."[17]

23.     Instead of adequately testing its Products like its competitors, Defendant chose to ignore the health of the consuming public in pursuit of profit.

## III.   The Presence (or Risk) of Toxic Heavy Metals In Defendant's Products Far Exceeds Expectations of Reasonable Consumers

24.     According to Global Market Insights, "[t]he demand for spices and seasonings has increased in recent years owing to their varied nutritional benefits."[18]   Indeed, "[m]ore Americans are considering the use of spices and herbs for medicinal and therapeutic/remedy use, especially for various chronic conditions" as "[t]here is now ample evidence that spices and herbs possess antioxidant, anti-inflammatory, antitumorigenic, anticarcinogenic, and glucose-and cholesterol -

---

[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] Global Market Insights, "North America Seasonings Market to Exceed $5bn by 2027," *Press Releases* (Oct. 22, 2021), https://www.gminsights.com/pressrelease/north-america-seasonings-market?utm_source=globenewswire.com&utm_medium=referral&utm_campaign=Paid_globenewswire (last accessed June 22, 2022).

---

lowering activities as well as properties that affect cognition and mood."[19]  As such, the safety of herbs and spices that can be easily purchased to season such food, amongst others, is a material fact to reasonable consumers (such as Plaintiffs and the Class members).

25.     Given the negative effects of toxic heavy metals (such as arsenic, lead, and cadmium) on child development and adult health, the presence of these substances in food is a material fact to reasonable consumers, including Plaintiffs and members of the Class.

26.     Defendant knows that the safety of its herbs and spices (as a general matter) is a material fact to reasonable consumers, as demonstrated below.

27.     As such, Defendant also knows that the presence (or risk) of toxic Heavy Metals in its herbs and spices is a material fact to reasonable consumers, including Plaintiffs and the Class members.

28.     A consumer survey confirms that purchasers of spices consider it important to know if there are Heavy Metals (or the risk of Heavy Metals) in the products even in small amounts. Plaintiffs' counsel conducted a nationwide survey of just over 500 adult consumers who bought spices, including Defendant's spices, within the past two years.[20]  The vast majority (approximately 94%) answered that the presence or risk of even a small amount of Heavy Metals in the spices would be either important or very important to their purchasing decisions.[21]

---

[19] T Alan Jiang, "Health Benefits of Culinary Herbs and Spices," *J AOAC Int*. 2019 Mar 1; 102(2): 395-411, 10.5740/jaoacint.18-0418 https://academic.oup.com/jaoac/article/102/2/395/5658185 (last accessed June 22, 2022).

[20] The survey included 503 participants over the age of 18, 259 of whom were female, 242 of whom were male, and 2 of whom were non-binary.  Some 67 percent of the participants were from the following states, with a minimum of 3% (15 participants) each:  Arizona, California, Florida, Illinois, Maryland, Michigan, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Texas and Washington.  The remaining approximately 33 percent, with a minimum of one participant each, were from the following states: Alabama, Alaska, Arkansas, Colorado, Connecticut, District of Columbia, Georgia, Hawaii, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Dakota, Oklahoma, Oregon, South Carolina, Tennessee, Utah, Virginia, West Virginia, and Wisconsin.

[21] The question in the survey was as follows: "A November 2021 report of an investigation by Consumer Reports reveals that certain brands of particular herbs and spices contain heavy metals consisting of lead, arsenic, and/or cadmium.  Please select how important, if at all, would it be to your purchasing decision if the spice(s) you purchased contained, or risked containing, even a small amount of the heavy metals previously described?"  The response choices provided were as follows:  Not at all important; important; very important.

---

29.     Herbs and spices manufacturers (such as Defendant) hold a special position of public trust. Consumers believe that they would not sell products that are unsafe.

30.     Defendant knew that if the presence (or risk) of toxic Heavy Metals in its herbs and spices was disclosed to Plaintiffs and the Class members, then Plaintiffs and the Class members would be unwilling to purchase them or would pay less for them.

31.      In light of Defendant's knowledge that Plaintiffs and the Class members would be unwilling to purchase the Products or would pay less for the Products if they knew that they contained (or risked containing) toxic Heavy Metals, Defendant intentionally and knowingly concealed this fact from Plaintiffs and the Class members and did not disclose the presence (or risk) of these toxic Heavy Metals on the labels of the Products.

32.     Defendant knew or should have known that Plaintiffs and the Class members would rely upon the packages of the Products and intended for them to do so but failed to disclose the presence (or risk) of Heavy Metals.

33.     Defendant knew or should have known that it owed consumers a duty of care to adequately test for Heavy Metals in the Products, which it failed to do.

34.     Additionally, Defendant knew or should have been aware that a reasonable consumer would consume the Products multiple times each day, and possibly multiple Products.  This leads to repeated exposure to the Heavy Metals.

35.     Defendant knew or should have known it could control the levels of Heavy Metals in the Products by properly monitoring the ingredients for Heavy Metals and adjusting any formulation to reduce or eliminate ingredients that contained or may contain higher levels of Heavy Metals.

36.     Prior to purchasing the Products, Plaintiffs and the Class members were exposed to, saw, read, and understood Defendant's labels, and relied upon them in purchasing the Products, but Defendant failed to disclose the presence (or risk) of Heavy Metals.

37.     As a result of Defendant's concealment of the fact that the Products contained toxic Heavy Metals, Plaintiffs and the Class members reasonably believed that Defendant's Products were free from substances that would negatively affect children's development as well as their own health.

38.    In reliance upon Defendant's labels that contained omissions, Plaintiffs and the Class members purchased Defendant's Products.

39.    Had Plaintiffs and the Class members known the truth—*i.e.*, that the Products contained (or risked containing) toxic Heavy Metals, rendering them unsafe for consumption by children and adults—they would not have been willing to purchase them or would have paid less for them.

40.    Therefore, as a direct and proximate result of Defendant's omissions concerning the Products, Plaintiffs and the Class members purchased the Products.

41.    Plaintiffs and the Class members were harmed in the form of the monies they paid for the Products which they would not otherwise have paid had they known the truth about the Products. Since the presence (or risk) of toxic Heavy Metals in herbs and spices renders them unsafe for human consumption, the Products that Plaintiffs and the Class members purchased are worthless or are worth less than Plaintiffs and the Class paid for them.

42.    Defendant's label omissions at issue in this Complaint are put in context by its rebranding efforts which have emphasized trust at nearly every point of interaction with consumers, including its logo, tag line, website, and commercials amongst others.

43.    For example, Defendant's CEO, Doug McMillon, stated that "a differentiating characteristic of our company will be that we still care about people, and they know it."[22]

44.    To do so, Defendant engaged the marketing agency, Lippincott, to rebrand.  As Lippincott notes, "How do you pivot the world's largest retailer to speak to a newly expanded consumer base, a new shopping experience, a new merchandise mix and a new level of confidence from its 1.5 million employees?  It requires a solid belief system that an internal culture will passionately rally behind, and it extends to a vibrant makeover that inspires everyone who walks through its doors."[23]

---

[22] Eric Pandey, "Walmart is rebranding itself as the most trusted company in America as Amazon increasingly becomes a villain," *Business Insider* (Feb. 14, 2019), https://www.businessinsider.com/walmart-is-rebranding-itself-as-the-most-trusted-company-in-america-as-amazon-increasingly-becomes-a-villain-2019-2 (last accessed June 22, 2022).
[23] Lippincott, "Walmart," https://lippincott.com/work/walmart/ (last accessed June 22, 2022).

45.     As a part of this effort, Defendant altered its logo.  According to the marketing agency, DesignRush, Defendant's new logo "makes Walmart appear like a brand you can trust, a brand that you want to trust and want to have on your side."[24]

46.     Lippincott states that this was a part of the purpose in also redesigning the tag line to "'Save money. Live better,' which resonates with legacy Walmart shoppers but also with new customer segments who see value as an enabler to a better, less compromised life.  Together, logo and tagline complete the simple but powerful value calculus of the newly enlivened brand."[25]

47.     In fact, so important is Defendant's tagline, "Save Money.  Live Better," to Defendant's business, that it has gone as far as to trademark that phrase.[26]

48.     And this rebranding effort has led to growth in sales for Defendant as it has worked to capture new consumer segments.  Lippincott stated that "[a]s a result, Walmart's performance on key brand attributes continues to improve" as "the company maintained traffic from core customers while growing traffic by approximately 7 percent from customers with incomes above $75,000—an underreported customer segment for Walmart prior to the brand revitalization."[27]

49.     These efforts have extended to Defendant's website where it further underscores its commitment to the consumer's well-being, noting, for example, that "[w]e take our responsibility as one of the world's largest grocers and retailers seriously.  Our customers expect that the food and products they buy from us are safe.  To earn their trust, we must source, transport, prepare, and sell safe and compliant food and merchandise.  We have high internal standards, and we expect the same of our suppliers."[28]

50.     Defendant further claims on its website that "Our commitment to ethics and integrity

---

[24] DesignRush, "Walmart's Modern Logo Adds Trust and Friendliness To The Major Retailer Through Welcoming Shapes and Colors," https://www.designrush.com/best-designs/logo/walmart (last accessed June 22, 2022).
[25] Id.
[26] Justia Trademarks, "Save Money. Live Better," https://trademarks.justia.com/859/49/save-money-live-85949496.html (last accessed June 22, 2022).
[27] Id.
[28] Walmart, "Build Trust with Our Customers," https://www.walmartethics.com/content/walmartethics/en_us/faqs/our-customers/sell-safe-food-and-products.html (last accessed June 22, 2022).

is reflected in our actions [including] [e]nsuring the food and products we sell are safe[.]"[29]

51.     Defendant also states on its website that "[t]o ensure the integrity of our products, we have developed and deployed a long-standing Quality Assurance Program to manage and control our global supply chain" and that "[w]e conduct millions of product analyses each year by testing for contaminants . . . and more to ensure the safety and quality of our products."[30]

52.     Defendant has also worked to inspire trust and confidence from consumers in its commercials.  In one commercial, for instance, Defendant asks: "can a company help you live a better life?  We're not talking about just any company.  We're talking about the one in your neighborhood . . . with almost two million people to help you live a better life everyday, we see your hopes and fears, your dreams and doubts.  It's why we show up day after day: to get you what you need, when you need it, to keep you healthy and safe, and to put a better meal on the table." Defendant makes these statements next to the following photograph of a family passing around a dinner plate:



53.     Defendant also highlighted this fact to shareholders, noting that "Our strategy is to make every day easier for busy families . . . and make trust a competitive advantage" and that "At every level of our Company, we work to create a culture that inspires trust among our . . .

---

[29] Walmart, "Purpose," https://corporate.walmart.com/purpose (last accessed June 22, 2022).
[30] Id.

customers."[31]

54.     Defendant further notes on its website that "[t]hrough our Great Value brands . . . we are delivering on our promise to provide customers with the quality products they need and want at a price they can afford to help them save money and live better."[32]

55.      And this effort has not been without consequence, as Defendant notes, "our largest brand Great Value does more than $27 billion a year globally."[33]

56.     Thus, when consumers, like Plaintiffs, interact with Defendant's   packaging— examples of which are set out below—they expect it to embody Defendant's brand, which as noted above, has continuously emphasized that it is worthy of consumers' trust because it places their health and safety at the fore.





[31] Walmart, Form 10-K, https://www.corporatereport.com/walmart/2022/ar/FY22_Walmart_Form_10-K.pdf (last accessed June 22, 2022).

[32] Walmart, 'Walmart's Revamped Brand Great Value Brand Delivers Affordably Quality Choices When Consumers Need Them Most," https://corporate.walmart.com/newsroom/2009/03/15/walmarts-revamped-great-value-brand-delivers-affordable-quality-choices-when-consumers-need-them-most (last accessed June 22, 2022).

[33] Dan Ochwat, "Walmart's Great Value brand earns more than $27 billion annually," *Storebrands* (Feb. 18, 2020), https://storebrands.com/walmarts-great-value-brand-earns-more-27-billion-annually (last accessed June 22, 2022).

57.     The foregoing statements on Defendant's website and other materials demonstrate that Defendant knows that reasonable consumers consider it important that the Products are safe and free from toxins such as the Heavy Metals.

58.     Based on Defendant's decision to tout the Products as trustworthy as well as the fact that the existence of Heavy Metals pertains to matters of safety, Defendant had a duty to tell the full truth about the presence (or risk) of Heavy Metals.

59.     The Products' labels are materially deceptive, false and misleading given Defendant's omission about the presence (or risk) of Heavy Metals as described above.

## **FED. R. CIV. P. 9(b) ALLEGATIONS**

60.     Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To the extent necessary, as detailed in the paragraphs above and below, Plaintiffs have satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity.

61.     **WHO**: Defendant made material omissions of fact in its packaging of the Products by omitting the presence (or risk) of Heavy Metals.

62.     **WHAT**: Defendant's conduct was and continues to be fraudulent and deceptive because it has the effect of deceiving consumers into believing that the Products do not contain (or risk containing) Heavy Metals. Defendant omitted from Plaintiffs and Class members that the Products contain (or risk containing) Heavy Metals. Defendant knew or should have known this information is material to all reasonable consumers and impacts consumers' purchasing decisions. Yet, Defendant has omitted from the Products' labeling the fact that they contain (or risk containing) Heavy Metals.

63.     **WHEN**: Defendant omitted from the Products' labeling the fact that the Products contain (or risk containing) Heavy Metals, continuously throughout the applicable relevant periods, including at the point of sale.

64.     **WHERE**: Defendant's omissions were made on the front labeling and packaging of the Products and were thus viewed by every purchaser, including Plaintiffs, at the point of sale in

every transaction. The Products are sold in brick-and-mortar stores and online stores nationwide.

65.     **HOW**: Defendant omitted from the Products' labeling the fact that they contain (or risk containing) Heavy Metals. And as discussed in detail throughout this Complaint, Plaintiffs and Class members read and relied on Defendant's front-label omissions before purchasing the Products.

66.     **WHY**: Defendant omitted from the Products' labeling the fact that they contain (or risk containing) Heavy Metals for the express purpose of inducing Plaintiffs and Class members to purchase the Products at a substantial price premium or more than they would have paid had they known the truth about the Products. As such, Defendant profited by selling the Products to at least thousands of consumers throughout the nation, including Plaintiffs and the Class members.

## CLASS ACTION ALLEGATIONS

67.     Plaintiffs bring this action individually and on behalf of all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23. The class definition(s) may depend on the information obtained throughout discovery. Notwithstanding, at this time, Plaintiffs bring this action and seek certification of the following proposed classes (collectively, the Classes):

> **Class**: All persons within the United States who purchased the Products from the beginning of any applicable limitations period through the date of judgment.

68.     Plaintiffs also bring this action on behalf of the following State Subclass:

> **California Subclass**: All persons who purchased the Products in the State of California from the beginning of any applicable limitations period through the date of judgment. [The Class and California Subclass are collectively referred to as the "Classes."]

69.     Excluded from the proposed Classes are the Defendant, and any entities in which the Defendant has controlling interest, the Defendant's agents, employees and its legal representatives, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, and all resellers of the Products.

70.     Plaintiffs reserve the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

71.     Plaintiffs further reserve the right to amend the above class definition as appropriate after further investigation and discovery, including by seeking to certify a narrower multi-state class

(or classes) in lieu of a nationwide class if appropriate.

72.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** At this time, Plaintiffs do not know the exact number of members of the Classes; however, given the nature of the claims and the number of retail stores in the United States selling the Products, Plaintiffs believe that the Class members are so numerous that joinder of all members is impracticable. While the exact number of Class members remains unknown at this time, upon information and belief, there are thousands, if not hundreds of thousands, of putative Class members. Moreover, the number of members of the Classes may be ascertained from Defendant's books and records. Class members may be notified of the pendency of this action by mail and/or electronic mail or other appropriate digital means, which can be supplemented if deemed necessary or appropriate by the Court with published notice.

73.     **Predominance of Common Questions of Law and Fact – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual Class members include:

    a.  whether the Products contain toxic Heavy Metals;

    b.  whether Defendant's conduct is unethical, oppressive, unscrupulous, and/or substantially injurious to consumers;

    c.  whether the amount of toxic Heavy Metals in the Products is material to a reasonable consumer;

    d.  whether Defendant had a duty to disclose that its Products had toxic Heavy Metals;

    e.  whether Plaintiff and members of the Classes are entitled to injunctive and other equitable relief;

    f.  whether Defendant failed to disclose material facts concerning the Products;

    g.  whether Defendant's conduct was unfair and/or deceptive;

    h.  whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for

Defendant to retain the benefits conferred upon Defendant by Plaintiffs and the Class members;

i.   whether Defendant breached implied warranties to Plaintiffs and the Class members;

j.   whether Defendant violated California consumer protection and deceptive practice statutes and are entitled to restitution and/or damages under such state statutes; and

k.   whether Plaintiffs and the Class members have sustained damages with respect to the common-law claims asserted, and if so, the proper measure of their damages.

74.     **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of those of the Class members because Plaintiffs, like other Class members, purchased, in a typical consumer setting, the Products and Plaintiffs sustained damages from Defendant's wrongful conduct.

75.     **Adequacy – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel that is experienced in litigating complex class actions.  Plaintiffs have no interests which conflict with those of the Classes.

76.     **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a class action, Plaintiffs and members of the Classes will continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated consumers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant.

77.     **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole. In particular, Plaintiffs seek to certify the Classes to enjoin Defendant from selling or otherwise distributing the Products until

such time that Defendant can demonstrate to the Court's satisfaction that the Products are accurately labeled. The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate equitable relief with respect to the Classes as a whole.

78.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons:

a.  The damages suffered by each individual members of the putative Classes do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct;

b.  Even if individual members of the Classes had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

c.  The claims presented in this case predominate over any questions of law or fact affecting individual members of the Classes;

d.  Individual joinder of all members of the Classes is impracticable;

e.  Absent a Class, Plaintiffs and members of the putative Classes will continue to suffer harm as a result of Defendant's unlawful conduct; and

f.  This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiffs and members of the putative Classes can seek redress for the harm caused by Defendant.

g.  In the alternative, the Classes may be certified for the following reasons:

i.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendant;

ii.   Adjudications of claims of the individual members of the Classes against Defendant would, as a practical matter, be dispositive of the interests of other members of the putative Classes who are not parties to the adjudication and may substantially impair or impede the ability of other putative Class members to protect their interests; and

iii.   Defendant has acted or refused to act on grounds generally applicable to the members of the putative Classes, thereby making appropriate final and injunctive relief with respect to the putative Classes as a whole.

## CAUSES OF ACTION

### FIRST COUNT
**California's Unfair Competition Law ("UCL")**
**Violation of California Business & Professions Code § 17200 *et seq.*,**
**Based on Fraudulent Acts and Practices**

79.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully stated herein.

80.   Plaintiffs bring this claim individually and on behalf of the California Subclass members.

81.   Under California Business & Professions Code §17200, any business act or practice that is likely to deceive members of the public constitutes a fraudulent business act or practice.

82.   Defendant has engaged, and continues to engage, in conduct that is likely to deceive members of the public.  This conduct includes but is not limited to its failure to disclose that the Products contain (or risk containing) toxic Heavy Metals.

83.   After reviewing the packaging for the Products, Plaintiffs purchased the Products in reliance on Defendant's omissions.  Plaintiffs would not have purchased the Products at all or would have paid less for them if they had known of Defendant's omissions regarding that the Products contain (or risk containing) toxic Heavy Metals. Plaintiffs and the California Subclass members have all paid money for the Products.  However, Plaintiffs and the California Subclass members did not obtain the full value or any value of the advertised products due to Defendant's omissions regarding

the toxic Heavy Metals.  Accordingly, Plaintiffs and the California Subclass members have suffered injury in fact and lost money or property as a direct result of Defendant's omissions.

84.     By committing the acts alleged above, Defendant has engaged in fraudulent business acts and practices, which constitute unfair competition within the meaning of California Business & Professions Code §17200.

85.     In accordance with California Business & Professions Code §17203,  Plaintiffs seek an order: (1) enjoining Defendant from continuing to conduct business through its fraudulent conduct; and (2) requiring Defendant to conduct a corrective advertising campaign.

86.     As a result of Defendant's conduct, Plaintiffs seek restitution, disgorgement, and injunctive relief under California Business & Professions Code §17203.

87.     Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law if, for instance, damages resulting from their  purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

88.     Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiffs and California Subclass members can reasonably rely on Defendant's packaging as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

89.     Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosures of the existence of Heavy Metals in the Products; or (2) the removal of such Heavy Metals from the Products, will ensure that Plaintiffs are in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at their  disposal.

1

2

3

**SECOND COUNT**
**California's Unfair Competition Law ("UCL")**
**Violation of California Business & Professions Code § 17200 *et seq.*,**
**Based on Unlawful Acts and Practices**

4

5

90.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully stated herein.

6

7

91.     Plaintiffs bring this claim individually and on behalf of the California Subclass members.

8

9

92.     The violation of any law constitutes an unlawful business practice under California Business & Professions Code §17200.

10

11

12

93.     Defendant has violated §17200's prohibition against engaging in unlawful acts and practices by, *inter alia*, making omissions of material facts, as set forth more fully herein, and violating Cal. Civ. Code § 1750 et seq., and by violating the Song-Beverly Act.

13

14

15

94.     By violating these laws, Defendant has engaged in unlawful business acts and practices, which constitute unfair competition within the meaning of Business & Professions Code §17200.

16

17

18

19

20

21

22

23

95.     Plaintiffs purchased the Products in reliance on Defendant's omissions as to the toxic Heavy Metals contained therein (or the risk of same).  Plaintiffs would not have purchased the Products at all or would have paid less for them had they known of Defendant's omissions.  Plaintiffs and the California Subclass members paid money for the Products.  However, Plaintiffs and the California Subclass members did not obtain the full value, or any value, of the advertised products due to Defendant's omissions regarding the Products.  Accordingly, Plaintiffs and the California Subclass members have suffered injury in fact and lost money or property as a direct result of Defendant's omissions.

24

25

26

96.     In accordance with California Business & Professions Code §17203, Plaintiffs seek an order: (1) enjoining Defendant from continuing to conduct business through its fraudulent conduct; and (2) requiring Defendant to conduct a corrective advertising campaign.

27

28

97.     As a result of Defendant's conduct, Plaintiffs seek restitution, disgorgement, and injunctive relief under California Business & Professions Code §17203.

98.     Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

99.     Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiffs and California Subclass members can reasonably rely on Defendant's packaging as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

100.     Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosures of the existence of Heavy Metals in the Products; or (2) the removal of such Heavy Metals from the Products, will ensure that Plaintiffs are in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at their disposal.

### THIRD COUNT
**California's Unfair Competition Law ("UCL")**
**Violation of California Business & Professions Code § 17200 *et seq.*,**
**Based on Unfair Acts and Practices**

101.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully stated herein.

102.     Plaintiffs bring this claim individually and on behalf of the California Subclass members.

103.     Under Business & Professions Code §17200, any business act or practice that is unethical, oppressive, unscrupulous, and/or substantially injurious to consumers, or that violates a legislatively declared policy, constitutes an unfair business act or practice.

104.    Defendant has engaged, and continues to engage, in conduct which is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers.  This conduct includes its failure to disclose that the Products contain (or risk containing) toxic Heavy Metals.

105.    Defendant has engaged, and continues to engage, in conduct that violates the legislatively declared policies of: (1) California Civil Code §§1572, 1573, 1709, 1710, 1711 against committing fraud and deceit; and (2) California Civil Code §1750 against committing acts and practices intended to deceive consumers regarding the representation of goods in certain particulars. Defendant gained an unfair advantage over its competitors, whose labeling, advertising, and marketing for other similar products must comply with these laws.

106.    Defendant's conduct is substantially injurious to consumers.  Such conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have purchased the Products at all or would have paid less for them but for Defendant's omissions regarding the presence (or risk) of toxic Heavy Metals in the Products.  Such injury is not outweighed by any countervailing benefits to consumers or competition.  Indeed, no benefit to consumers or competition results from Defendant's conduct.  Since consumers reasonably rely on Defendant's labels, and thus also its omissions, consumers could not have reasonably avoided such injury.  *Davis v. Ford Motor Credit Co*., 179 Cal. App. 4th 581, 597-98 (2009); *see also Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010) (outlining the third test based on the definition of "unfair" in Section 5 of the FTC Act).

107.    By committing the acts alleged above, Defendant has engaged in unfair business acts and practices which constitute unfair competition within the meaning of Business & Professions Code §17200.

108.    Plaintiffs purchased the Products based on Defendant's labels, which omitted the presence (or risk) of toxic Heavy Metals in the Products.  Plaintiffs would not have purchased the Products at all or would have paid less for them but for Defendant failing to disclose that they contained (or risked containing) toxic Heavy Metals.  Plaintiffs and the California Subclass members paid money for the Products.  However, Plaintiffs and the California Subclass members did not

obtain the full value or any value of the Products due to Defendant's omissions regarding the nature of said Products.  Accordingly, Plaintiffs and the California Subclass members suffered an injury in fact and lost money or property as a direct result of Defendant's material omissions.

109.    Because Defendant's conduct is ongoing, Plaintiffs seek an order enjoining Defendant from continuing to conduct business through its fraudulent conduct and further seek an order requiring Defendant to conduct a corrective advertising campaign in accordance with California Business & Professions Code §17203.

110.    As a result of Defendant's conduct, Plaintiffs seek restitution, disgorgement, and injunctive relief under California Business & Professions Code §17203.

111.    Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

112.    Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiffs and Class members can reasonably rely on Defendant's packaging as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

113.    Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosures of the existence of Heavy Metals in the Products; or (2) the removal of such Heavy Metals from the Products, will ensure that Plaintiffs are in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at their disposal.

## FOURTH COUNT
### (Violation of California's False Advertising Law, California Business & Professions Code §§ 17500, et seq.,)

114.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully stated herein.

115.    California's False Advertising Law prohibits any statement in connection with the sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code § 17500.

116.    As set forth herein, the Plaintiffs purchased the Products based on Defendant's labels, which constituted advertising and which omitted the presence (or risk) of toxic Heavy Metals in the Products.

117.    Plaintiffs would not have purchased the Products at all or would have paid less for them but for Defendant failure to disclose that they contained (or risked containing) toxic Heavy Metals.

118.    Plaintiffs and the California Subclass paid money for the Products.  However, they did not obtain the full value or any value of the Products due to Defendant's omissions regarding the nature of the Products.  Accordingly, Plaintiffs and the California Subclass members suffered an injury in fact and lost money or property as a direct result of Defendant's omissions.

119.    Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiffs' desire to purchase these Products in the future and hope to rely on Defendant's marketing and packaging.

120.    Plaintiffs and members of the California Subclass are entitled to injunctive and equitable relief, and restitution in the amount they spent on the Products.

121.    Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

122.    Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiffs and Class members can

reasonably rely on Defendant's packaging as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

123.    Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosures of the existence of Heavy Metals in the Products; or (2) the removal of such Heavy Metals from the Products, will ensure that Plaintiffs are in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at their disposal.

## FIFTH COUNT
### California's Consumer Legal Remedies Act
### Cal. Civ. Code § 1750 et seq. ("CLRA")

124.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully stated herein.

125.    Plaintiffs bring this claim individually and on behalf of the California Subclass members.

126.    Plaintiffs purchased Defendant's Products for household use.

127.    The acts and practices of Defendant as described above were intended to deceive Plaintiffs and the California Subclass members as described herein, and have resulted, and will result, in damages to Plaintiffs and members of the California Subclass.  These actions violated, and continue to violate, the California Consumers Legal Remedies Act ("CLRA") in at least the following respects:

a.  In violation of California Civil Code §1770(a)(5) of the CLRA, Defendant's acts and practices constitute omissions that the Products have characteristics, uses, and/or benefits, which they do not;

b.  in violation of California Civil Code §1770(a)(7) of the CLRA, Defendant's acts and practices constitute omissions that the Products are of a particular quality, which they are not; and

c.   in violation of California Civil Code §1770(a)(9) of the CLRA, Defendant's acts and practices constitute the advertisement of the goods in question without the intent to sell them as advertised.

128.   By committing the acts alleged above, Defendant has violated the CLRA.

129.   Plaintiffs and the California Subclass members suffered injuries caused by Defendant's omissions because they were induced to purchase the Products they would not have otherwise purchased or would have paid less for if they had known that they contained (or risked containing) toxic Heavy Metals.

130.   In compliance with the provisions of California Civil Code §1782, Plaintiffs' counsel sent written notice to Defendant on January 8, 2022, informing Defendant of their intention to seek damages under California Civil Code §1750, *et seq.*  The letter stated that it was sent on behalf of all other persons similarly situated.  Accordingly, Plaintiffs seek damages from Defendant for its violations of the CLRA. Defendant has failed to respond to or remedy the issues raised in the notice letterregarding the Products.

131.   Plaintiffs and the California Subclass members are also entitled to, pursuant to California Civil Code §1780, an order enjoining the above-described wrongful acts and practices of Defendant, and any other relief deemed appropriate and proper by the Court under California Civil Code §1780.

132.   Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

133.   Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiffs and Class members can reasonably rely on Defendant's packaging  as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

134.    Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price, and an injunction requiring either (1) adequate disclosures of the existence of Heavy Metals in the Products; or (2) the removal of such Heavy Metals from the Products, will ensure that Plaintiffs are in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at their disposal.

## SIXTH COUNT
### Breach of Implied Warranty Under the Song-Beverly Act
### Cal. Civ. Code § 1790 et seq.

135.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully stated herein.

136.    Plaintiffs bring this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

137.    Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790, *et seq*., every sale of consumer goods in this State is accompanied by both a manufacturer's and retail seller's implied warranty that the goods are merchantable, as defined in that Act.  In addition, every sale of consumer goods in this State is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

138.    The Products at issue here are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

139.    Plaintiffs and the California Subclass members who purchased one or more of the Products are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

140.    Defendant is in the business of manufacturing, assembling, producing and/or selling the Products to retail buyers, and therefore is a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

141. Defendant impliedly warranted to retail buyers that the Products were merchantable in that they: (a) would pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Products are used. For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements. Defendant breached these implied warranties because the Products were unsafe and contained (or risked containing) toxic Heavy Metals. Therefore, the Products would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used, which is consumption by consumers.

142. Plaintiffs and the California Subclass members purchased the Products in reliance upon Defendant's skill and judgment in properly packaging and labeling the Products.

143. The Products were not altered by Plaintiffs or the California Subclass members.

144. Defendant knew that the Products would be purchased and used without additional testing by Plaintiffs and the California Subclass members.

145. As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and the California Subclass members have been injured and harmed because they would not have purchased the Products or would have paid less for them if they knew the truth about the Products, namely, that they contained (or risk containing) toxic Heavy Metals.

## SEVENTH COUNT
### Breach of Implied Warranty of Merchantability

146. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully stated herein.

147. Plaintiffs bring this claim individually and on behalf of the members of the Class and, in the alternative, the California Subclass against Defendant.

148. Defendant is a merchant engaging in the sale of goods to Plaintiffs and the Classes.

149. There was a sale of goods from Defendant to Plaintiffs and the Classes.

150. As set forth herein, Defendant manufactured and sold the Products, and prior to the time the Products were purchased by Plaintiffs and the members of the Classes, impliedly warranted

that the Products were of merchantable quality and fit for their ordinary use (consumption by consumers).

151.    Defendant impliedly warranted to retail buyers that the Products were merchantable in that they: (a) would pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Products are used.  Defendant breached these implied warranties because the Products were unsafe and contained (or risked containing) toxic Heavy Metals.  Therefore, the Products would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used, which is consumption by consumers.

152.    Plaintiffs and the Class members purchased the Products in reliance upon Defendant's skill and judgment in properly packaging and labeling the Products.

153.    The Products were not altered by Plaintiffs or the Class members.

154.    Defendant knew that the Products would be purchased and used without additional testing by Plaintiffs and the Class members.

155.    Defendant was on notice of this breach as it was aware of the inclusion (or risk) of Heavy Metals in the Products,  including based on the public investigation by Consumer Reports that showed the Products contain Heavy Metals.

156.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and the Class members have been injured and harmed because they would not have purchased the Products or would have paid less for them if they knew the truth about the Products, namely, that they contained (or risked containing) toxic Heavy Metals.

157.    On January 8, 2022, Plaintiffs' counsel provided notice to Defendant, apprising Defendant of its breach of warranties.  This letter was sent on behalf of all "similarly situated purchasers."  Defendant did not respond.

158.    Plaintiffs, on behalf of themselves  and the members of the Classes, seek actual damages for Defendant's failure to deliver goods that conform to its implied warranties and resulting breach.

## EIGHTH COUNT
### Fraud

159.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully stated herein.

160.    Plaintiffs bring this claim individually and on behalf of the members of the Class and, in the alternative, the California Subclass against Defendant.

161.    Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To the extent necessary, as detailed in the paragraphs above and below, Plaintiffs have satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

      a.  **WHO**: Defendant made omissions of fact in its packaging of the Products by omitting the presence (or risk) of Heavy Metals.

      b.  **WHAT**: Defendant's conduct was and continues to be fraudulent and deceptive because it has the effect of deceiving consumers into believing that the Products do not contain (or risk containing) Heavy Metals. Defendant omitted from Plaintiffs and Class members that the Products contain (or risk containing) Heavy Metals. Defendant knew or should have known this information is material to all reasonable consumers and impacts consumers' purchasing decisions. Yet, Defendant has omitted from the Products' labeling the fact that they contain (or risk containing) Heavy Metals.

      c.  **WHEN**: Defendant made omissions detailed herein, including omitting that the Products do contain (or risk containing) Heavy Metals, continuously throughout the applicable relevant periods.

      d.  **WHERE**: Defendant's omissions were made on the front labeling and packaging of the Products and were thus viewed by every purchaser, including Plaintiffs, at the point of sale in every transaction. The Products are sold in brick-and-mortar stores and online stores nationwide.

e. **HOW**: Defendant omitted from the Products' labeling the fact that they contain (or risk containing) Heavy Metals. And as discussed in detail throughout this Complaint, Plaintiffs and Class members read and relied on Defendant's front-label omissions before purchasing the Products.

f. **WHY**: Defendant omitted from the Products' labeling the fact that they contain (or risk containing) Heavy Metals for the express purpose of inducing Plaintiffs and Class members to purchase the Products at a substantial price premium or more than they would have paid had they known the truth about the Products. As such, Defendant profited by selling the Products to at least thousands of consumers throughout the nation, including Plaintiffs and the Class members.

162.    As alleged herein, Defendant made these material omissions in order to induce Plaintiffs and Class members to purchase the Products.

163.    As alleged in detail herein, Defendant knew the omissions regarding the Products were false and misleading but nevertheless made such omissions on the Products' labeling. In reliance on these omissions, Plaintiffs and Class members were induced to, and did, pay monies to purchase the Products.

164.    Had Plaintiffs and the Class members known the truth about the Products, they would not have purchased them or would have paid less for them.

165.    As a proximate result of the fraudulent conduct of Defendant, Plaintiffs and Class members paid monies to Defendant, through its regular retail sales channels, to which Defendant is not entitled, and have been damaged in an amount to be proven at trial.

### NINTH COUNT
**Unjust Enrichment**

166.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully stated herein.

167.    Plaintiffs bring this claim individually and on behalf of the members of the Class and, in the alternative, the California Subclass against Defendant either together or in the alternative to

the legal claims asserted above.

168.    Plaintiffs and the Class members conferred a benefit on Defendant in the form of the gross revenues Defendant derived from the money they paid to Defendant.

169.    Defendant had an appreciation or knowledge of the benefit conferred on it by Plaintiffs and the Class members.

170.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs and the Class members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because Defendant omitted that the Products contained (or risked containing) toxic Heavy Metals.  This caused injuries to Plaintiffs and members of the Classes because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

171.    Defendant accepted and retained the benefit in the amount of the gross revenues it derived from sales of the Products to Plaintiffs and the Class members.

172.    Defendant has thereby profited by retaining the benefit under circumstances which would make it unjust for Defendant to retain the benefit.

173.    Plaintiffs and the Class members are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the Products.

174.    As a direct and proximate result of Defendant's actions, Plaintiffs and Class members have suffered in an amount to be proven at trial.

175.    Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

176.    Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Product so that Plaintiffs and Class members can

reasonably rely on Defendant's  packaging as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

177.    Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price will ensure that Plaintiffs are in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at their disposal.

<u>**TENTH COUNT**</u>
**(Negligent Failure to Warn)**

178.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully stated herein.

179.    Plaintiffs bring this claim individually and on behalf of the Class and, in the alternative, the California Subclass.

180.    At all relevant times, Defendant was responsible for manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Products and its packaging.  At all relevant times, it was reasonably foreseeable by Defendant that the use of the Products in their intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiffs and the Class members as the ultimate users of the Products.

181.    At all relevant times, Defendant knew or had reason to know of the risk of injury and the resultant harm that the Products posed to Plaintiffs and the Class members, as the problems discussed throughout existed at the time of its manufacturing, inspection, distribution, labeling, marketing, advertising, and/or sale.

182.    Defendant as the manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Products had a duty to warn Plaintiffs and the Class members of all dangers associated with the intended use of the Products.

183.    At a minimum, the duty arose for Defendant to warn consumers that the use of the Products was unreasonably dangerous.

184.    Defendant was negligent and breached its duty by negligently failing to provide warnings to consumers and users of the Products, including Plaintiffs and the Class members, regarding the true nature of the Products and their risks and potential dangers.

185.    Defendant was negligent and breached its duty of care by concealing the risks of and failing to warn consumers that the Products contain Heavy Metals known to cause adverse health effects in humans.

186.    Defendant knew, or through the exercise of reasonable care, should have known of the problems discussed and resulting dangers associated with consuming the Products, and knew that Plaintiffs and Class members could not reasonably be aware of those risks.  Defendant failed to exercise reasonable care in providing Plaintiffs and the Class members with adequate warnings.

187.    As a direct and proximate result of Defendant's failure to adequately warn consumers that the use of the Products, including their intended use, could cause and has caused injuries and other damages, Plaintiffs and the Class members have suffered damages, as described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that the Court grant Plaintiffs and all members of the proposed Classes the following relief against Defendant:

a.    That the Court certify the Classes under Rule 23 of the Federal Rules of Civil Procedure and appoint Plaintiffs as Class Representatives and their attorneys as Class Counsel to represent the members of the Classes;

b.    That the Court declare that Defendant's conduct violates the statutes referenced herein;

c.    That the Court preliminarily and permanently enjoin Defendant from conducting business through the unlawful, unfair, or fraudulent business acts or practices, untrue, and misleading labeling and marketing and other violations of law described in this Complaint;

d.    That the Court order preliminary and injunctive relief requiring Defendant to disclose that the Products contain toxic Heavy Metals;

e.   That the Court order Defendant to implement whatever measures are necessary to remedy the unlawful, unfair, or fraudulent business acts or practices, untrue and misleading advertising, and other violations of law described in this Complaint;

f.   That the Court order Defendant to notify each and every individual who purchased the Products of the pendency of the claims in this action to give such individuals an opportunity to obtain restitution from Defendant;

g.   For an award of compensatory damages, the amount of which is to be determined at trial;

h.   For punitive damages;

i.   That the Court grant Plaintiffs' reasonable attorneys' fees and costs of suit pursuant to California Code of Civil Procedure §1021.5, California Civil Code §1780(d), the common fund doctrine, and/or any other appropriate legal theory; and

j.   That the Court grant such other and further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: June 24, 2022                          **BURSOR & FISHER, P.A.**

By:  ___/s/ L. Timothy Fisher_____

L. Timothy Fisher (State Bar No. 191626)
Sean L. Litteral (State Bar No. 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Email:  ltfisher@bursor.com
            slitteral@bursor.com

Jonathan Shub (SBN 237708)
Kevin Laukaitis*
**SHUB LAW FIRM LLC**
134 Kings Highway E, 2nd Floor
Haddonfield, NJ 08033
T: 856-772-7200
F: 856-210-9088

jshub@shublawyers.com
klaukaitis@shublawyers.com

Gary E. Mason*
Danielle L. Perry (State Bar No. 292120)
**MASON LLP**
5101 Wisconsin Avenue NW, Suite 305
Washington, DC 20016
Tel: 202-640-1168
Fax: 202-429-2294
gmason@masonllp.com
dperry@masonllp.com

Lori G. Feldman*
**GEORGE GESTEN MCDONALD PLLC**
102 Half Moon Bay Drive
Croton-on-Hudson, New York 10520
Tel: 917-983-9321
lfeldman@4-justice.com
eservice@4-justice.com

David J. George*
Brittany L. Brown*
**GEORGE GESTEN MCDONALD, PLLC**
9897 Lake Worth Road, Suite #302
Lake Worth, FL 33467
Tel: (561) 232-6002
Fax: (888) 421-4173
dgeorge@4-justice.com
bbrown@4-justice.com
eservice@4-justice.com

Michael Liskow (State Bar No. 243899)
**CALCATERRA POLLACK LLP**
1140 Avenue of the Americas, 9th Floor
New York, New York 10036
Tel: 212-899-1765
Fax: 332-206-2073
mliskow@calcaterrapollack.com

***Pro Hac Vice Application Forthcoming***

*Attorneys for Plaintiffs and the Proposed Classes*

1

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

2

I, L. Timothy Fisher, declare as follows:

3

1.      I am an attorney at law licensed to practice in the State of California and a member

4

of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiffs

5

Susan Gagetta and Tracie Gomez in this action.  Ms. Gagetta is a resident of Antioch, California.

6

Ms. Gomez is a resident of Morgan Hill, California.  I have personal knowledge of the facts set forth

7

in this declaration and, if called as a witness, I could and would competently testify thereto under

8

oath.

9

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code

10

Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the

11

Eastern District of California.

12

I declare under the penalty of perjury under the laws of the State of California and the United

13

States that the foregoing is true and correct and that this declaration was executed at Walnut Creek,

14

California this 24th day of June 2022.

15

16

_____*/s/ L. Timothy Fisher*_____
                    L. Timothy Fisher

17

18

19

20

21

22

23

24

25

26

27

28

VENUE DECLARATION